UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )  )  | |
| v.   )   )  | Case No.: 1:07-CR-103 |
| BRETT JONES )  | |

**MEMORANDUM OF OPINION AND ORDER**

This matter is before the court on the motion to suppress filed by the defendant, Brett Jones ("Jones") on February 28, 2008. Docket at 29 and 30, respectively. The court held a hearing on the motion on March 19, 2008. At the conclusion of the hearing, the court instructed the parties to file additional briefing. Jones filed his supplemental brief[1] on April 11, 2008 (Docket at 38) and the United States of America ("the government") filed a response in opposition to the motion on April 28, 2008 (Docket at 39). Jones filed a reply brief on May 8, 2008. Docket at 42. For the reasons discussed herein, the motion to suppress is GRANTED in part and DENIED in part.

**FACTUAL BACKGROUND**

Jones was charged by way of an indictment with one count of possession with intent to distribute cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1). The indictment, filed on December 19, 2007 (Docket at 1), was based on events that occurred on September 27, 2007, when Jones was arrested by Fort Wayne Police officers following a traffic stop.

---

[1] Jones filed a brief in support of his motion simultaneously with the motion itself. Docket at 30. The court will refer to this as "Defendant's First Brief." The supplemental brief Jones filed on April 11 is referred to as "Defendant's Supplemental Brief." The government's brief is designated "Government's Response," and Jones's May 8 brief is designated "Defendant's Reply." References to the transcript of the March 19, 2008, hearing are referred to as "Tr., p. __."

On that day in September, Fort Wayne Police Detective Darrick Engelman was traveling in a police cruiser near downtown Fort Wayne when he spotted Jones driving a white, 1992 Lexus. Tr., pp. 5-6. Engelman testified that he recognized Jones from "an ongoing [drug] investigation" police were conducting involving Jones and also because Engelman "had prior dealings with Mr. Jones" involving "drug interdiction stops[.]" *Id*., p. 6. Engelman had another officer, Detective Gigli, run a "check" on Jones on Gigli's in-car computer. *Id*. That computer check confirmed that Jones had a suspended driver's license. *Id*., p. 7. Because of that, Engelman activated his car's emergency lights and initiated a traffic stop of Jones "in the parking lot of George's International Grocery Store at Broadway and Taylor." *Id*. Engelman testified that he advised Jones that "he had a suspended driver's license." *Id*. Engelman testified that he knew, at the time he pulled Jones over, that Jones had a record of prior drug arrests. *Id*. Engelman also testified that over the course of 18 months or so prior to this date, police had received tips from "reliable informants that Mr. Jones has been dealing in crack cocaine." *Id*., p. 8. Engelman also stated that these informants told police that Jones had a custom of transporting crack "in his buttocks." *Id*.

After stopping Jones in the store parking lot, Engelman approached Jones and noticed that his "pants [were] unzipped and unbuttoned in the front. His pants were midway down through his buttocks." *Id*., p. 9. After questioning from the court, Engelman clarified that he noticed Jones's unzipped and unbuttoned pants once Jones "was removed from his car." *Id*. Engelman testified that the condition of Jones's pants "could be seen on car video." *Id*. (Engelman was referring to the videotape of the traffic stop taken from his police car video camera and which was introduced at the hearing as Defendant's Exhibit A.) Engelman also

2

stated that Jones was "very" nervous at the time of the traffic stop. *Id*.

At that point, Jones was placed under arrest for driving with a suspended driver's license. *Id*., p. 10. He was placed in handcuffs and Engelman conducted a search of Jones's person. *Id*. During that search, Engelman discovered "several bundles of U.S. currency individually bundled in separate plastic baggies." *Id*.[2] Engelman testified that based on his many years of experience and training, "[t]he manner in which the money was packaged was consistent with currency associated with narcotics dealings. The way it was packaged up and the manner in which the denominations, how they were–they were packaged accordingly to $500 per bundle or stack." *Id*., pp. 10-11. Engelman testified that the money Jones had totaled approximately $2,500 in cash. *Id*., p. 11.

Following his arrest, Jones was taken to the "lock-up" where he was taken to a secure area. *Id*. Engelman testified that this was done because Engelman advised jail staff that police "had prior knowledge of Mr. Jones concealing contraband in his buttocks area." *Id*. In this secure area, Jones was made to remove his clothing. *Id*., p. 12. When he did so, Engelman testified that he "immediately saw a clear plastic bag sticking from in between [Jones's] buttocks crack [sic]." *Id*. According to Engelman, this plastic bag was "clearly visible." *Id*., p. 13. Engelman testified that the plastic bag was between Jones's buttocks and not in his anus. *Id*. Engelman instructed Jones to remove the plastic bag from between his buttocks and, when he did so, Engelman could clearly see "a white rock-like substance" which later tested positive for the presence of cocaine. *Id*. At some point after the contraband was discovered, Engelman asked

---

[2] The money was in Jones's pants pocket and Engelman felt it when he was patting down Jones. This is evident on the videotape of the stop taken from Engelman's patrol car. Defendant's Exhibit A.

Jones "if he wanted to talk about what had taken place." *Id*., p. 14.  At first, Jones replied "no," but later–according to Engelman–Jones "advised that he knew that it was a matter of time before he got caught and he was going to take his punishment like a man." *Id*.  It is undisputed that Jones was not given *Miranda* warnings either at the scene of his arrest or later at the police lock-up.  Engelman testified that he never attempted to interview Jones and that Jones's statement was "a voluntary statement." *Id*.

On cross examination, Engelman testified that he informed Jones almost immediately after pulling him over that he was being placed under arrest for driving with a suspended license. *Id*., p. 18.  Engelman admitted that after he placed Jones in handcuffs, he asked him some questions, including whether he had a job.  *Id*., pp. 18-19.  Engelman also recalled telling Jones that the money taken from his pockets would become the property of the Fort Wayne Police Department since Jones said he did not have a job.  *Id*., p. 19.  Engelman admitted that Jones was not advised of his *Miranda* rights at the time of this arrest or before Engelman asked Jones some questions.[3]  Engelman also told his fellow officer, Detective Gigli, to "search [Jones's] car like you've never searched a car." *Id*.  Neither the search of Jones's car at the scene nor the inventory search of the vehicle after police towed it uncovered any contraband.  *Id*., p. 15.

Once Jones was transported to the lock-up, Engelman testified that he did not inform Jones of his *Miranda* rights before taking him into the secure room in the lock-up or before conducting the strip search.  *Id*., p. 30.  (It is undisputed, however, that Jones was under arrest

---

[3] The videotape of the incident shows that Engelman asked Jones whether he had a job, where he got the money that was discovered in his pockets, where he lived, where he stayed the night before, where he was coming from before he was pulled over, and where he was going. Defendant's Exhibit A.

4

before he was taken to the lock-up.) On cross examination, Engelman reiterated that he told Jones to remove his clothing and to remove the plastic bag from between his buttocks, which Engelman again testified was readily visible once Jones removed his pants. *Id*., p. 29. Engelman denied that the plastic bag was inside of Jones's anus or that when it was removed it was covered in blood and/or feces. *Id*., p. 30.

On redirect examination, Engelman testified that in his experience, it was commonplace for drug traffickers to transport drugs in their buttocks. *Id*., p. 34. Asked why this method of carrying drugs was utilized, Engelman testified that "[i]t's just a method of concealment. If the guy on the street corner is stopped by an officer, it cannot be felt on the normal *Terry* frisk. . . . Usually it's in the butt crack area because it's easily obtainable. They just can reach around and grab it real quick, tear off what they need, and put it back." *Id*., pp. 34-35. Engelman also testified that in his experience, he has never seen drug dealers actually insert bags of drugs into their anuses. *Id*., p. 35. Engelman also testified that even though he had not advised Jones of his *Miranda* rights, Jones never answered Engelman's questions during the traffic stop anyway. *Id*., pp. 35-36.[4] Engelman was the government's only witness at the suppression hearing.

Jones also testified at the suppression hearing. *Id*., pp. 33-59. Jones's testimony concerning the traffic stop was largely consistent with that of Engelman.[5] However, Jones's

---

[4] As far as the record reveals at this point, the only incriminating statement Jones made after his arrest was his alleged comment that "it was only a matter of time" until he got caught and that he would "take his punishment like a man."

[5] Jones did testify that at one point during the traffic stop Engelman told him "I finally got you now." Tr., p. 43. Jones also testified that after Engelman discovered the plastic bags of money in Jones's pocket and placed them on the trunk of the car, the officer said, "from now on this is my car. You don't drive this car. I drive it." None of these alleged statements, however, can be heard on the audio/video recording of the traffic stop, which the court reviewed several

5

account of the strip search that took place at the lock-up differed dramatically from Engelman's account.  For instance, Jones testified that just after he removed his clothing, an officer or officers grabbed him, "twisted my arm, and it was folded up . . ." *Id.*, p. 44.  Jones testified that at that point the officers and/or jail personnel used physical force on him, at least to some degree. *Id.*  Jones further testified as follows:

> They push[ed] down on my shoulder.  It's like I was paralyzed.  I couldn't move my whole right side.  And he said, now what I want you to do is I want you to take your other hand.  I said, what?  And then they start–whoever it was, start pushing my arm.  I said, hold on just a minute.  I'll do it.  He said, what I want you to do is take your other hand, reach around stick it up there, and pull it out, so I turn around and did that.  When–and when I turn around and did that, I seen the bag.  It was a white Baggie.
> . . .
>
> The bag was white, and it was like feces all over it.  I could smell the strong odor 'cause something I drunk, but you know, I smell a strong odor, but I could see the streaks of blood, so I'm looking at that.  Darrick Engelman said, what I want you to do now is drop it to the floor.  He said, no, this is what I want you to do: I want you to pick it up.  So I picked it off up off the floor.  Then he said, this is what I want you to do: I want you to put it in this bag, so I opened like a big freezer bag, like a clear freezer bag.  And he said drop it in, so I dropped it in.  So that's when Darrick turned and left the room.  Then all of a sudden, I was about to get up.  I'm like–I don't want to use profanity in court, but I'm like this, what the "F" is this?  I looked at it, so I touched the–you know, back there, and I seen right between my anal and my testicles, it was like a–tore right there.  I don't know if I tore–something, but I looked on my hand.  And then Jean Gigli, he said–I said, what the "F" did you just made me do?  He said, you'll be okay.  I'm like, okay?  I won't be okay.  He said, put back on your clothes.  I was like, no, you help me.  You know what I'm saying?  So I start coming out of the padded room kind of half naked.  I couldn't put my arm in my shirt.  My right arm was like–I don't know.  It was like I was paralyzed.  Then all of a sudden, like five or ten minutes later, it just came–my arm came back to function, I don't know.

*Id.*, pp. 44-46.

---

times.

Jones also testified that he had actually swallowed the plastic baggie of crack cocaine approximately four or five hours before he was pulled over by Engelman. *Id*., pp. 46-47. He said he began drinking prune juice sometime after that in order to flush the bag of drugs out of his body. *Id*., p. 50. According to Jones, this caused him to become bloated and, when he bent over during the strip search, "I think some kind of way feces start coming out of my anal [sic]. It was like a strong odor." *Id*., p. 47. Jones also testified that when he was pulled over by Engelman, his pants were zipped and were not falling off him while he was seated in the car or when he got out of the car. *Id*., pp. 48-49. Jones further testified that he was not in the habit of wearing his pants low on his hips. *Id*., p. 50. Finally, when asked by the court why he swallowed the bag of drugs, Jones (after a noticeably lengthy silence) answered, "Depression. I was depressed." *Id*. In response to questions posed by his attorney, Jones testified that he had a scar between his testicles and his anus, that he did not have the scar prior to the events of September 27, 2007, and that he would be willing to submit to a medical exam to confirm the existence of the scar. *Id*., p. 59.

The government recalled Engelman to the stand to rebut portions of Jones's testimony. Engelman reiterated that the plastic bag containing the crack cocaine was located in Jones's buttocks, not inside his anus. *Id*., p. 52. Engelman also reiterated that when Jones pulled the bag from between his buttocks it did not have either blood or feces on it. *Id*. Engelman also testified that Jones never asked for medical attention following the strip search, nor did he indicate in any way that he was experiencing any medical distress or medical problem. *Id*., p. 53.

7

**DISCUSSION**

In his motion to suppress, Jones "requests this Court to suppress evidence seized from and statements allegedly made by him at the time of his arrest for the following reasons: . . . [h]e was not properly advised of his right to remain silent [and] [h]e was subjected to a body cavity search following his arrest for driving while suspended without a warrant or probable cause." Motion to Suppress, p. 1.  Therefore, Jones argues that the circumstances underlying his encounter with police and his subsequent arrest violated his Fourth Amendment right to be free from unreasonable search and seizure.

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. Amend. IV.  The Amendment reads in full: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  The Fourth Amendment does not require officers to carry warrants with them, and the United States Supreme Court noted in *United States v. Grubbs,* 547 U.S. 90 (2006), that judges must not add to the Constitution's requirements.  A court evaluates the constitutionality of a particular search by "balancing ... the need for the particular search against the invasion of personal rights that the search entails."  *Bell v. Wolfish,* 441 U.S. 520, 559 (1979).  In doing so, the court considers "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Id.*  As the Seventh Circuit has observed, "[t]he more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the

8

search is being conducted." *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir. 1983) (citing *Terry v. Ohio,* 392 U.S. 1, 18 n. 15, (1968)).

In the present case, Jones does not allege that the traffic stop itself was illegal, even though he challenges, to some degree, Engelman's account of what took place during the stop. Jones does not claim that Engelman's reason for pulling him over, i.e., that his license was suspended, was disingenuous.[6] Jones implies that the questions Engelman posed to him in the minutes after he was placed under arrest (as enumerated above) were improper in that Jones had not been advised of his *Miranda* rights at that point. However, this fact (which is undisputed) is not one of the bases for Jones's motion to suppress. In any event, as the government is quick to point out, Jones did not answer any of Engelman's questions at that time. The only admission he made was that he did not have a job, which understandably made it suspicious that he was in possession of almost $2,500 in cash.

What Jones actually challenges in his motion is the strip search that took place in the lock-up and the statement he made while in custody that he knew it was only a matter of time until he got caught and that he intended to take his punishment "like a man." As to the alleged statement, Engelman testified that it was offered voluntarily and was not the result of an interrogation. Tr., p. 14. However, Jones argues that the statement was made while he was in the secure room at the lock-up, surrounded by at least four uniformed officers. Defendant's First

---

[6] At one point in his testimony, Jones claimed that he had not been stopped previously for driving with a suspended license. Tr., p. 48. Engelman, on the other hand, testified that Jones, in fact, had a prior "driving while suspended" charge on his record. *Id.*, p. 10. Engelman testified that he arrested Jones for driving with a suspended license "and prior," meaning this was not Jones's first such offense. *Id.* Neither side pursued this discrepancy in their briefing and it is inconsequential since Jones does not challenge the legal sufficiency of the traffic stop.

9

Brief, p. 4.  Jones argues that "[t]he coercive effect of the circumstances make any utterance by Mr. Jones involuntary." *Id*.  Jones points out that "*Miranda* is implicated when suspects . . . are subjected to 'custodial interrogation.' *Illinois v. Perkins*, 496 U.S. 292 (1990).  Custodial interrogation refers to 'questioning by law enforcement officers after a person has been taken into custody . . . ."  That questioning need not involve a formal, sit-down interview, but arises anytime an officer attempts to elicit incriminating information from someone in custody. *Pennsylvania v. Muniz*, 496 U.S. 582 (1990)." *Id*., p. 5.  The government, in its response brief, does not even address this issue, focusing solely on the issue of the strip search. *See* Government's Response, generally.  The court agrees with Jones that the statement he made was made under circumstances where its voluntary nature is suspect.  Nothing prevented Engelman or any other officer present from advising Jones of his right to remain silent, but this was not done for whatever reason.  Engelman admitted in court that when he first asked Jones whether he wanted to "talk about what had taken place" Jones responded "no."  Tr., p. 14. At some point shortly after that, according to Engelman, Jones volunteered the statement.  The fact that the statement was made only after Jones was in custody and surrounded by police officers, and only after Jones first stated that he did not want to talk about the incident, is of great concern to the court.  Engelman offered no explanation as to why Jones, after stating that he did not wish to talk, was not advised of his *Miranda* rights at that point.  For these reasons, Jones's motion to suppress is granted as to the statement he made while in custody.

       The issue of the strip search is another matter.  To begin with, Jones's version of what occurred as he presented it at the hearing, was simply not credible.  Jones's explanation that he had swallowed the bag containing 16 grams of crack cocaine some hours before he was arrested

10

because he was "depressed," and his declaration that he was drinking prune juice in an attempt to flush the bag out of his body, was not believable. Jones's testimony was incredible and his demeanor during that testimony suggested that his story was fabricated. In any event, Jones does not contest that the bag of crack cocaine was discovered in his buttocks during the strip search. Rather, he testified to a scenario that, if believed, would indicate that the strip search was more physical in nature, and therefore arguably more intrusive, than Engelman said it was. But the real issue is whether police were justified in conducting the strip search in the first place, not whether anyone twisted Jones's arm or caused him to feel "paralyzed" on the right side of his body as he testified.[7]

Jones states that "[b]ody cavity searches are one of the most offensive and intrusive of all types of searches. Probable cause is required before a body cavity search is conducted; the preference for warrants applies to such searches." Defendant's First Brief, p. 6 (citing *Schmerber v. California*, 384 U.S. 757 (1966)). This statement is correct. The government, however, argues that police had ample reason to conduct the strip search following Jones's arrest. The United States Supreme Court has recognized that strip searches can be, under certain

---

[7] This aspect of Jones's testimony was also not credible. The evidence is inconclusive with regard to what amount of physical force, if any, officers may have used against Jones in order to get him to comply with the strip search. What is undisputed, however, is that Jones did not request medical attention after the search, so apparently (even by his own version of events) he did not sustain any physical injury during the search, although he may have experienced some degree of physical discomfort or distress. Also, Jones has not presented any medical evidence–or any evidence at all–that he ever underwent a physical examination to confirm his claim that he suffered a cut or tear between his anus and his testicles. But again, whether the bag of crack was readily visible once Jones removed his pants (as Engelman adamantly maintained during his testimony) or whether it began exiting his anus due to his "bloated" condition (as he maintained), goes only to the issue of credibility and not to the issue of the legality of the strip search. Since the court concludes that Engelman's version of the events was much more credible, this factual dispute need not be addressed further.

11

circumstances, a valid means of discovering evidence.  *Bell v. Wolfish*, 441 U.S. 520 (1979) (practice of strip searching detainees to prevent transportation of contraband into jail or prison is fully consistent with the Constitution).  As the government points out, "[p]olice officers may conduct a strip search of an arrestee entering a jail when they have reasonable suspicion at the time of the search that he is concealing contraband on his body."  Government's Response, p. 4 (citing *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997) and *Kraushaar v. Flanigan* 45 F.3d 1040, 1045 (7th Cir. 1995)).  "That particularized suspicion may arise from such factors as the nature of the offense, the arrestee's appearance and conduct, *and the prior arrest record*."  *Id*. (citing *Way v. County of Ventura*, 445 F.3d 1157, 1162 (9th Cir. 2006) and *Kraushaar*, 45 F.3d at 1045) (italics added by the government).  The government argues that since Jones was known to police as a result of ongoing drug investigations, since police had information that he transported drugs in his buttocks, and since he had $2,500 in cash on him at the time of his arrest (suspiciously packaged in plastic bags), police had a reasonable suspicion that Jones might be carrying contraband on him at the time of his arrest.  *Id*.

     The government then discusses the case of *United States v. Logan*, 219 Fed.Appx. 533 (7th Cir. 2007), which it says (and the court agrees) is "factually very similar" to the present case.  *Id*.  In *Logan*, the defendant was arrested following a traffic stop.  When the arresting officer pulled the defendant over and approached his car, he detected the smell of burnt marijuana and he recognized Logan "from previous police encounters and because he was the target of a local drug trafficking investigation."  *Logan*, 219 Fed.Appx. at 534.  Logan was arrested and strip searched, and police found two bags of crack cocaine between his buttocks.  The trial court denied Logan's motion to suppress the drugs found during the strip search.  Logan ended up

12

pleading guilty to possession of a controlled substance with intent to distribute, but in his plea agreement he retained his right to appeal the legality of the strip search. The Seventh Circuit held that "[b]ecause the officers had reasonable suspicion that Logan was hiding drugs on his body when they conducted the search, we affirm." *Id*.

In its Order, the Seventh Circuit provided a recitation of the series of events testified to at Logan's suppression hearing. The facts of that case were as follows:

> Logan was arrested in Beloit, Wisconsin after a chain of events recounted at the evidentiary hearing held on his motion to suppress. Officer Roel Benavides-a drug and gang investigator with the Beloit Police Department-testified that on February 3, 2006 he received a report from a fellow officer that a white four-door car failed to stop at stop sign. Benavides, who was on patrol near the intersection, located and stopped the car. When Benavides approached the car, he smelled burnt marijuana and recognized Logan as the driver. Benavides was familiar with Logan from previous police encounters and because he was the target of a local drug trafficking investigation. Benavides also knew that Logan had sold drugs to undercover officers in the course of that investigation. Benavides began writing a citation (in addition to running the stop sign Logan was driving on a suspended license) and requested backup and a drug-sniffing dog. The dog arrived with its handler and alerted to Logan's car. The officers then searched the car and found a "grape-sized" piece of crack in the pocket of Logan's jacket, which was lying on the car's back seat. Benavides informed Logan that he was under arrest and conducted a pat-down search, which revealed another drug (marijuana), $2,209 in cash, and two cell phones.
>
> Neither side offered testimony at the hearing regarding the details of the strip search, but the parties agree that after the arrest, officers took Logan to the Beloit police station, and before booking him into the Rock County Jail, they conducted a strip search. The officers found between his buttocks two plastic baggies containing a total of 25.76 grams of crack. In his motion to suppress Logan did not challenge the scope or manner in which the strip search was conducted; he argued that initiating the strip search violated the Fourth Amendment because, according to him, the officers had no reason to believe he was hiding drugs on his body. The district court denied the motion, explaining that because Logan had drugs hidden in his car and his clothing, it was reasonable for the officers to suspect he was also hiding drugs in his body cavities.
>
> In challenging the suppression ruling, Logan renews his argument that at the time of the strip search, the officers had no reason to believe that he was hiding drugs

13

>   on his body.  Logan believes that upholding this search would authorize police to
>   strip search anyone who was arrested for a felony drug offense.  He also claims
>   that the small amount of drugs recovered from his car and clothing were
>   consistent with the officers' suspicion that he was merely a low-level drug dealer,
>   so they had no reason to believe he was hiding more drugs elsewhere on his body.

*Id*.  The appellate court then proceeded to analyze the facts of the case in light of the established law concerning strip searches.  The court explained as follows:

>   . . . The Supreme Court has recognized strip searches as a valid means to prevent
>   detainees from smuggling drugs into detention facilities.  *See Bell v. Wolfish,* 441
>   U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).  Police officers may
>   conduct a strip search of an arrestee entering a jail when they have reasonable
>   suspicion at the time of the search that he is concealing contraband on his body.
>   *See Swain v. Spinney,* 117 F.3d 1, 7 (1st Cir. 1997); *Kraushaar v. Flanigan,* 45
>   F.3d 1040, 1045 (7th Cir. 1995).  Although jail officials may view any arrestee
>   entering the detention system with at least a minimal amount of suspicion, *see
>   Stanley v. Henson,* 337 F.3d 961, 967 (7th Cir. 2003), they must have a
>   particularized suspicion that the arrestee is harboring contraband on his body
>   before conducting a strip search, *see Kraushaar,* 45 F.3d at 1045; *Weber v. Dell,*
>   804 F.2d 796, 802 (2nd Cir. 1986).  That particularized suspicion may arise from
>   such factors as "the nature of the offense, the arrestee's appearance and conduct,
>   and the prior arrest record."  *Way v. County of Ventura,* 445 F.3d 1157, 1162 (9th
>   Cir. 2006); *Kraushaar,* 45 F.3d at 1045.
>
>   Under these factors the officers had reason to believe that Logan was hiding drugs
>   on his body when they strip-searched him.  He was arrested for drug possession,
>   and before the strip search the police knew that he was a suspected drug dealer
>   who recently had sold drugs to undercover officers.  As for his appearance and
>   conduct, although Logan did not make any statements or actions to tip off the
>   officers that he had crack between his buttocks, *see, e.g., Brack,* 188 F.3d at 758
>   (strip search reasonable where minor traffic offender suspected in drug
>   investigation asked to use bathroom upon arrival at jail); *Kraushaar,* 45 F.3d at
>   1046 (same where DUI arrestee made suspicious hand movements near his
>   waistband), the officers had already found two different drugs hidden in his car
>   and in his clothing.  Aware of his current possession of concealed drugs and
>   history of trafficking, the officers had a sufficient basis to suspect that he was
>   hiding additional drugs underneath his clothing.  *See, e.g., Applewhite v. U.S. Air
>   Force,* 995 F.2d 997, 1000-01 (10th Cir. 1993) (strip search reasonable where
>   arrestee had participated in undercover drug buy and pat-down revealed drugs in
>   her purse and stockings).  And because Logan was about to enter the jail, the
>   officers had a substantial security interest in conducting the strip search "to either
>   dispel or confirm" their suspicion that he possessed drugs.  *See Kraushaar,* 45
>   F.3d at 1046.

*Id*., pp. 534-35.

      The facts of the *Logan* case are indeed strikingly similar to those in the present case. Detective Engelman was familiar with Jones and his history of suspected drug activity. Since Jones was undisputedly guilty of driving with a suspended license, Engelman had cause to initiate the traffic stop and to arrest Jones. During a pat down search, Engelman discovered nearly $2,500 in cash in Jones's pocket, packaged suspiciously in plastic bags. Jones admitted to Engelman that he was unemployed and when asked where he got so much cash, Jones replied "I had it." Jones's answers to Engelman's questions about where he had just come from and even where he lived and/or slept were vague, to say the least. Engelman was familiar with Jones as a result of police investigations into drug activity in Fort Wayne. Engelman also had information from informants that Jones was a drug dealer and often transported drugs in his buttocks.

      In addition, Engelman testified that when he pulled Jones over and approached Jones's car, he noticed that Jones's pants were unzipped and pulled down. This was a point of contention at the suppression hearing, as noted above. Engelman insisted that Jones's pants were unzipped and riding very low on his hips, while Jones insisted that was not true. The court reviewed the videotape of the traffic stop and arrest in an attempt to resolve this factual dispute. In that videotape, it is clear that when Jones steps out of his vehicle, he is wearing a long, dark colored shirt that extends below his waist. Jones's waist and his pants at his waist are not visible at that point. Once Engelman handcuffs Jones, begins his pat down, and pulls the plastic bags of cash from Jones's front pants pocket, it appears that Jones's pants are hanging rather low on his hips. His waist is still not visible in the videotape, although the rear pockets of his pants have stitching on them which is visible and those pockets do appear to be hanging very low on Jones's

15

body.  Engelman then places the bags of money on the trunk lid of Jones's car and turns Jones to begin escorting him to Engelman's police car.  At that point in the videotape, it appears again that Jones's pants are very low and it also appears that a portion of Jones's lower body–from above his waist to the top of his right thigh–is visible.  While the videotape is not absolutely conclusive on the point, it does seem to corroborate Engelman's version of the facts and refute Jones's.  It is not possible to tell from the videotape, for example, whether Jones's pants were unzipped at the time.  However, it does appear that his pants were very low on his body–certainly well below his waist.  Thus, this supports Engelman's testimony and refutes Jones's testimony that his pants were not unzipped, not pulled down, and not being worn in a "low slung" fashion.  Therefore, the court finds Engelman's testimony on this point to be credible.

     Based on all of these facts and the totality of the circumstances, the court concludes that police had reasonable suspicion to believe that Jones might be hiding drugs on his body and, consequently, were justified in conducting a strip search when Jones was taken to jail.  For these reasons, Jones's motion to suppress is DENIED as it relates to the strip search and the evidence obtained therefrom.

## CONCLUSION

For the reasons discussed in this memorandum, the motion to suppress filed by the defendant, Brett Jones, is GRANTED in part and DENIED in part.

Date: June 10, 2008.

 /s/   William C. Lee
William C. Lee, Judge
United States District Court
Northern District of Indiana
